



## COMPETITION COMMISSION OF INDIA

### Case No. 36 of 2024

*In Re:*

**Ravi Sharma**                                                          **Informant**
C- 128, 2nd Floor
Lajpat Nagar – I
New Delhi – 110 024

**And**

**Adani Enterprises Ltd.**                                    **Opposite Party-1/OP-1**
Shantigram, Near Vaishnodevi Circle
SG Highway, Ahmedabad- 382421
Gujarat, INDIA

**M/s Adani Green Energy Four Limited**            **Opposite Party-2/OP-2**
4th floor-South Wing
Shantigram, SG Highway, Ahmedabad- 382421
Gujarat, INDIA

**Mr. Gautam S. Adani**                                    **Opposite Party-3/OP-3**
Adani House, near Mithakhali Crossing,
Navrangpura, Ahmedabad – 380 009

**Mr. Sagar R. Adani**                                      **Opposite Party-4/OP-4**
Shantigram, Near Vaishnodevi Circle
SG Highway, Ahmedabad- 382421
Gujarat, INDIA

**M/s Azure Power India Private Limited**          **Opposite Party-5/OP-5**
3rd Floor, Asset 301-304 & 307 World Mark 3, Aerocity
New Delhi – 110 037

**Solar Energy Corporation of India**                **Opposite Party-6/OP-6**
Block Tower 2, NBCC Tower Block B
East Kidwai Nagar Kidwai Nagar New Delhi – 110 023

**Andhra  Pradesh  Central  Power  Distribution  Corporation
Limited**                                                         **Opposite Party-7/OP-7**
Beside Polytechnic College, ITI Road
Vijaywada, Krishna





Andhra Pradesh – 520 008

**Andhra Pradesh Eastern Power Distribution Company Limited**                                                    **Opposite Party-8/OP-8**
P & T Colony,
Seethammadhara, Visakhapatnam
Andhra Pradesh - 530 013

**Andhra Pradesh Southern Power Distribution Company Limited**                                                    **Opposite Party-9/OP-9**
19-13-65/A, Srinivaspuram
Tiruchanoor Road
Andhra Pradesh,
Tirupati – 517 501

**Government of Andhra Pradesh**                                                    **Opposite Party-10/OP-10**
Energy Department
A.P. Secretariat
Velagapudi, Amravati
Andhra Pradesh – 522 237

**GRIDCO Limited**                                                    **Opposite Party-11/OP-11**
Janpath Bhubaneshwar
Khurda Odisha – 751 002

**Tamil Nadu Generation and Distribution Corporation**                  **Opposite Party-12/OP-12**
144, Anna Salai
Chennai - 600 002

**CORAM:**

**Ms. Ravneet Kaur**
**Chairperson**

**Mr. Anil Agrawal**
**Member**

**Ms. Sweta Kakkad**
**Member**

**Mr. Deepak Anurag**
**Member**



## Order under Section 26(2) of the Competition Act, 2002

1. Information in the present matter was filed by Shri Ravi Sharma ('**Informant**'), under Section 19(1)(a) of the Competition Act, 2002 (the '**Act**'), against Adani Enterprises Ltd. ('**OP-1**'), Adani Green Energy Limited ('**OP-2**'), Shri Gautam S. Adani ('**OP-3**'), Shri Sagar R. Adani ('**OP-4**'), Azure Power India Private Limited ('**OP-5**'), Solar Energy Corporation of India Ltd. ('**OP-6**'/'**SECI**'), Andhra Pradesh Central Power Distribution Corporation Ltd. ('**OP-7**'), Andhra Pradesh Eastern Power Distribution Company Limited ('**OP-8**'), Andhra Pradesh Southern Power Distribution Company Limited ('**OP-9**'), Government of Andhra Pradesh, Energy Department ('**OP-10**'), GRIDCO Ltd. ('**OP-11**'), and Tamil Nadu Generation and Distribution Corporation ('**OP-12**'/'**TANGEDCO**'), alleging contravention of the provisions of the Act.

2. In the Information, OP-1 to OP-4 are stated to be members of the Adani Group. It is stated that OP-1 is their flagship company owned by OP-3. OP-4 is the nephew of OP-3 and is an Executive Director in OP-2. OP-2 is a 100% subsidiary of OP-1 and is in the business of renewable energy. The Informant has stated that OP-1 and OP-2 collectively hold a substantial market share of approx. 16% of India's total power generation capacity. OP-5 is stated to be a subsidiary of a United States ('**US**') based company and is also involved in the business of renewable energy generation. OP-6 is stated to be a company under the Ministry of New and Renewable Energy ('**MNRE**'), Government of India, whose mission is, *inter alia*, to promote increase of renewable energy in India. OP-7 to OP-12 are stated to be State owned power distribution companies who have signed agreements to purchase power from OP-6.

3. It is stated that on 25.06.2019, OP-6 issued a Request for Selection ('**RfS**') document along with standard Power Purchase Agreement ('**PPA**'/'**PPAs**') and Power Sales Agreement ('**PSA**'/'**PSAs**') for selection of solar power developers for setting up of 7 GW ISTS connected Solar PV Power Plant linked with setting up of 2 GW (per annum) Solar Manufacturing Plant. Package A of the same included setting up of Solar Manufacturing Plants related to Cell (500 MW) and Modules (500 MW), while Package B included setting up of Solar Manufacturing Plants related to Ingots (500 MW) and Wafers (500 MW). Two Blocks were to be allocated under each package. The successful bidders were assured PPAs up to 2000 MW against 500 MW Solar Manufacturing Plants under Bidding Package A and



up to 1500 MW against 500 MW manufacturing capacity under Package B. It is alleged by the Informant that OP-6 has designed the RfS documents to favor top players like OP-1, OP-2 and OP-5 that if no bidders come forward for any of the bid capacity under aforesaid packages, OP-6 will automatically award remaining capacity to the successful bidders, through the 'Transferred Capacity' namely underbidding/undersubscribed capacity under either of the packages. The maximum ceiling under the RfS was ₹2.93 per kilowatt hour ('**KwH**') for 25 years. The last date of bid submission was 13.11.2019.

4. It is further stated that the techno-commercial bids were opened on 14.11.2019 and the financial bids were opened on 21.11.2019. 3 bidders qualified *namely,* OP-2, OP-5 and one Navayuga Engineering Co. Ltd. Thereafter, e-Reverse Auction was held on 22.11.2019 and pursuant to the same, Letter of Awards ('**LoAs**') dated 10.12.2019 were awarded to 2 successful bidders *viz.* OP-2 and OP-5 @ ₹2.92/KwH.

5. As per the Information, the LoA awarded to OP-2 was for cumulative capacity of 2GW towards manufacturing facilities and 8GW towards solar power projects, while the LoA awarded to OP-5 was for 1GW towards manufacturing facilities and 4GW towards solar power projects. It was a part of the Addendum to the LoAs that "... *in the event, for any reason, there is no willing Buying Utility(ies) to enter into a Power Supply Agreement ('PSA') and procure the power from SECI fully or in part, then to the extent of such quantum for which the Buying Utility(ies) are not forthcoming, the PPA shall not be entered into with ... and there shall not be any legal or financial implication to SECI in relation to such quantum including associated quantum of manufacturing facilities. ... Further, ... shall be entitled to sell power generated from solar power plants setup under the scheme to any party or exchange under intimation to SECI for the capacity for which capacity corresponding PSA(s) are not entered into with buying utilities.*"

6. With regard to specific clauses of the RfS and the entire chain of events subsequent to issue of RfS, the Informant has *inter-alia* alleged that: (a) RfS document was designed in a manner to ensure participation of only big players in the market; (b) RfS document was prepared in contravention of the Ministry of Power ('**MoP**') guidelines in as much that the said guidelines do not allow clubbing of solar power plants with solar manufacturing plants; (c) 'Green Shoe Option' was provided by OP-6 in contravention of MoP guidelines to favour top players like OP-1, OP-2 and OP-5; (d) LoAs and Addendum to LoAs were issued to OP-2 and OP-5; (e)




undertakings were given by OP-2 *vide* letter dated 08.06.2020 and by OP-5 *vide* letter dated 16.07.2020 to OP-6 stating that in case there is no buying utility willing to enter into a PSA with OP-6, they will continue to perform their obligations as per LoAs without creating any binding obligation on OP-6; (f) *Vide* letter dated 02.02.2021 and letter dated 18.02.2021. OP-2 and OP-5 respectively unilaterally reduced the quoted bid price to 2.54 kWh from 2.92 kWh against the spirit of MoP guidelines; (g) *Vide* letters dated 22.07.2021, OP-2 and OP-5 unilaterally gave undertaking for waiver of Basic Customs Duty for the capacity awarded under package 1; (h) Subsequently, OP-6 started signing PSAs with OP-7 onwards; (i) Subsequently, OP-6 signed 42 PPAs with OP-2 and subsidiaries of OP-1 and OP-2 and 24 PPAs with Special Purpose Vehicles of OP-5; (j) OP-5 has not even commenced the basic activities related to awarded project capacity and OP-6 has not cross checked the development of project activities on the part of OP-5; (k) OP-5 sent a letter to OP-6 on 07.12.2022 informing that 2333 MW projects are commercially unavailable due to non-fulfilment of the condition precedent on account of Public Interest Litigation ('**PIL**') *vide* no 237/2021 and PIL *vide* no 76 of 2022 before Hon'ble High Court of Andhra Pradesh and conditional regulatory approval by Central Electricity Regulatory Commission ('**CERC**'). Neither any coercive actions have been taken by High Court of Andhra Pradesh against any of the parties nor any stay orders were passed against the Bidding process or against OP-6 as on date. On 19.01.2023, OP-5 and OP-6 met and discussed the letter dated 07.12.2024 and again on 21.12.2024, OP-5 sent a letter to OP-6 with new excuse that their lender's inability to finance 2333 MW projects and confirmed that they will continue with execution of 800 MW projects (package 1) along with 1 GW manufacturing facility; (l) *Vide* letter dated 02.03.2023, OP-5 has shown its intentions that 2333 MW projects capacity which was awarded to them, shall be transferred to other Bidder *i.e.* in present case is OP-2 only; (m) On 06.07.2023, OP-2, OP-5 and OP-6 had a meeting where they decided to transfer the 2333 MW projects capacity which was awarded to OP-5 to OP-2; (n) *Vide* letter dated 12.10.2023, OP-6 checked the final decision of OP-5 to clear their stand to transfer the 2333 MW Projects capacity to OP-2 by 16.10.2023. *Vide* letter dated 16.10.2023, OP-5 informed OP-6 that they are constrained to terminate the PPAs and requested to return the PBG of 116.65 Cr corresponding to 2333MW; (o) OP-6 in a hurried manner without even looking for any other person or interested party, have signed PPA for 1799 MW capacity with OP-2 which again shows that the whole bidding process was just a cover to allocate the entire bidding capacity of 2000 MW solar power plant with 2000 MG manufacturing project to OP-2; (p) On 23.02.2024, OP-6 have issued




addendum to LoA to OP-2 for transferring the entire 2333 MW Projects' capacity; (q) *Vide* letter dated 18.03.2024, OP-6 affirmed to OP-5 regarding termination of 2333 MW PPAs and transferring the same to OP-2,; (r) Finally, on 02.05.2024, OP-5 surrendered the remaining capacity of 700 MW which was awarded under package 1 and same has also been reallocated to OP-2.

7. The Informant has stated that in this regard, Department of Justice ('**DoJ**') and Securities Exchange Commission ('**SEC**') in the US filed detailed chargesheet/indictment dated 24.10.2024 showing how OP-1 to OP-4, in connivance with OP-5, abused their market dominance and while indulging in anti-competitive practices, acquired many renewable energy generation plants.

8. The Informant has stated that in terms of the US indictment, OP-3, OP-4 and their other business executives allegedly bribed the Indian government to finance lucrative contracts designed to benefit their businesses and finally, through indirect means, also acquired the 2.3 GW solar power project of OP-5 with the help of OP-6. They also defrauded investors by raising capital on the basis of false statements about bribery and corruption, while other OPs attempted to conceal the bribery conspiracy by obstructing the US government's investigation.

9. As per the Informant, beginning in or around the year 2020, affiliates of OP-1 to OP-5, while acting within the scope of their employment as officers and employees, knowingly and wilfully, conspired and agreed with each other, including but not limited to OP-3 and OP-4, to offer, authorise and to pay bribes, influenced through their market position, combination and in anti-competitive practices, to and for their benefit, caused OP-7 to OP-12 to enter into PSA with OP-6, in order for OP-1, OP-2 and OP-5 to obtain and retain business.

10. As per the Informant, since the aforesaid acts were done on Indian soil and directly impact competition therein, the present Information has been filed in larger public interest. Further, since OP-1 to OP-4 in combination with OP-5 have abused their dominant market position and were involved in anti-competitive practices, and since OP-1 and OP-2 collectively account for 16% of all power generated by private sector power plants during Financial Year 2023, the Commission has jurisdiction in the matter.



11. Regarding the RfS issued by OP-6, it is alleged that the same was issued in contravention of the guidelines issued by the MoP to favour top players like OP-1, OP-2 and OP-5. The bidding documents were designed in such a fashion that no other bidder could participate in the bid but OP-1 and OP-2, and OP-5 had participated as only the proxy of OP-1 and OP-2 to re-allocate their project capacity later on to OP-2. As such, OP-1 to OP-6, by way of their conduct, indulged in anti-competitive practices to oust other entities from participating in the bid and created a monopoly. It is alleged that OP-6's dereliction of duty to not cross-check development of 4 GW solar project and 1 GW solar manufacturing project by OP-5 further shows that bidding and award of bid was a mere cover and ultimate aim was to transfer the entire 12 GW capacity to OP-1 to OP-4 for extraneous benefits.

12. Further, it is also alleged that OP-1 and OP-2 who collectively dominate the power generation market with 16% or more market share, through this process not only abused their market dominance but also created a platform where all other interested power generation companies were ousted from competition.

13. Therefore, in light of the above, the Informant has prayed for the following reliefs: (a) Hold and declare that an act of contravention of the abuse of market dominance and anti-competitive practices has taken place due to act and conduct of the OPs; (b) Hold and declare that acts and conduct of the OPs have adverse effect on competition in the market; (c) Issue an order of restraint and impose appropriate penalty; and (d) Pass any other order or relief which is deemed fit in the interest of justice.

14. The Commission considered the Information in its ordinary meeting held on 12.02.2025 and decided to seek certain additional information from the Informant within a period of 04 (four) weeks.

15. However, no such additional information was received. The Commission, *vide* order dated 14.05.2025, in the interest of justice, granted to the Informant, one last opportunity to furnish the additional information sought by the Commission *vide* order dated 12.02.2025, within a period of 04 (four) weeks.

16. Accordingly, the Informant filed an Additional Affidavit in compliance with order dated 12.02.2025, on 06.06.2025.



17. The Commission considered the Additional Affidavit filed by the Informant in its ordinary meeting held on 09.07.2025 and noting the submissions made therein, decided to seek from the Informant, detailed information and supporting evidence in respect of his allegations regarding abuse of dominance by the Adani Group or any Adani Group entity, to be filed within a period of 04 (four) weeks

18. Accordingly, the Informant filed another Additional Affidavit on 24.07.2025.

19. In the above Affidavits, the Informant has stated that the specific conduct amounting to abuse of dominant position by the Adani Group involves OP-2's rapid and large-scale capacity expansion aimed at foreclosing competition through aggressive greenfield growth. The magnitude and pace of its expansion effectively deters market entry or expansion by smaller competitors who cannot keep up without incurring unsustainable losses. As per the Informant, the Adani Group is leveraging its broader ecosystem to gain cost and scale advantages for OP-2 that constitutes exclusionary practices in renewable energy market.

20. It is stated that OP-2's greenfield expansion is supported by advanced resource planning and supply-chain management through affiliated entities such as Adani Infra India Ltd. and Adani Infrastructure Management Services Pvt. Ltd. These Adani entities are leveraging economies of scale in PPAs to reinforce dominant position and discourage competition. It is further stated that OP-2, while positioned as a 'pure-play renewable' entity, benefits from cross-subsidisation through its association with the broader Adani Group, which includes Adani Power, Adani Transmission, and other infrastructure affiliates. It is alleged that OP-2 is not operating in financial isolation but instead draws on financing facilitated through group-level arrangements. It is supported by a capital ecosystem that includes funds from its allied companies, including Adani Power and Adani Transmission. OP-2's access to below-market capital, enabled by group affiliations, lowers its cost of capital significantly compared to other independent green energy developers, giving it an unfair competitive edge.

21. Further, the Informant also stated that OP-2 is not just a dominant entity in renewable energy sector but is also planning vertical expansion into infrastructure critical for energy delivery *i.e.*, transmission and logistics. Adani Group is also gaining control over a critical distribution market *viz.* Mumbai being one of India's largest electricity load centers. With transmission and last-mile distribution under its belt, Adani Group holds substantial gatekeeping power




over what electricity gets wheeled into this high-demand urban region. This enables self-preferencing, where OP-2's green energy is prioritised for grid access, rebate eligibility, or transmission scheduling, while independent or rival producers face delays, technical denials, or financial disincentives. This creates a barrier to entry and deters rival renewable companies from bidding or scaling up.

22. As per the Informant, such control over infrastructure, especially in renewable and thermal power, allows OP-2 to impose discriminatory terms or pricing, limiting competitors' operations, in violation of the provisions of Section 4(2)(b) and 4(2)(e) of the Act. It is stated that Adani Group's conduct qualifies as abuse under Section 4(2) of the Act in the following manner: (a) Imposition of unfair conditions in bidding through alleged cover bidding; (b) Limiting production and market access through capacity hoarding; (c) Exclusionary PPAs and long-term tie-ups with major state utilities; (d) Leveraging vertical dominance from mining to generation and transmission; (e) Creation of artificial entry barriers by monopolising land and transmission infrastructure; (f) Holding of more than 40% cumulative market shares in renewable energy and thermal (conventional and non-conventional) *etc.*

23. Further, as per the Informant, tariff data from SECI auctions during 2019–2020 show highly competitive solar bids as low as INR 2.48/kWh. However, despite the trend of falling tariffs, the structuring of impugned RfS documents and financial dominance allowed entities like OP-2 to capture disproportionate market share by potentially gaming auction mechanisms with higher tariff of INR 2.92/kWh.

24. The Informant has stated that OP-2 is dominant in the market for utility scale renewable energy generation in India which includes large-scale, grid-connected, solar power projects that supply electricity to the national grid. These projects are distinct due to their scale, technology, and operational characteristics. On the basis of its total operational capacity and its year-on-year growth, it is the largest renewable energy company in India. Further, Adani Power holds a large amount of thermal power capacity accounting for more than 25% market share in the country. Thus, if the shares of two are combined, it surges to near about 40% of India's renewable and thermal capacity.

25. Subsequently, the Commission *vide* order dated 03.09.2025, noted that the matter pertains to the generation and distribution of solar power in the country and in view of the same, the Commission decided to seek the views/ comments of MNRE, upon the issues highlighted in




the Information with a request to provide its comments thereupon within a period of 04 (four) weeks.

26. *Vide* letter dated 28.10.2025, MNRE conveyed that OP-6 is a Central Public Sector Enterprise ('**CPSE**') under the administrative control of the MNRE and has issued the tender for '*Scheme for Setting up of Solar Manufacturing Plant linked with PPAs for Solar PV Power Plant*', and forwarded the comments received from OP-6 on the Information.

27. In its comments, OP-6 stated that it has been designated as the Renewable Energy Implementing Agency ('**REIA**') for implementation of MNRE schemes having an intermediary role. It invites bids under a process of Tariff Based Competitive Bidding ('**TBCB**') based on the Guidelines floated by the MNRE and the MoP for selection of developers for wind/ solar/ hybrid/ battery projects, enters into PPAs at the discovered tariff with the developers and executes a corresponding PSA with buying entity(ies) for sale of the power purchased from the developers.

28. OP-6 has further stated that in carrying out its role as an intermediary trader, it is bound to follow the regulatory compliances provided under the Electricity Act, 2003 ('**EA**'). The tariff is discovered in a competitive bid process through a process of TBCB e- reverse auction ('the *e-RA*').

29. OP-6 stated that as required under Clause 10.4 of the Guidelines for Tariff Based Competitive Bidding Process for Procurement of Power from Grid Connected Solar PV Power Projects of the MoP dated 28.07.2023, a conformity certificate declaring that '*the bid documents are in line with the provisions of the corresponding Guidelines*' is submitted to the CERC in the tariff adoption petition filed by OP-6 (as intermediary procurer).

30. It is stated that under the TBCB, all the techno-commercially qualified bidders who participated in the tender are invited for the process of e-RA in line with the terms and conditions of the RfS. Post the completion of e-RA, the successful bidders are selected following the bucket filling approach and by comparing the bids on the basis of the bidding criteria as specified in the RfS, *i.e.* the fixed tariff or the first-year tariff and ranking of bidders starts from the bidder quoting the "lowest tariff (L1)". The tariff so discovered is placed for adoption u/s 63 of the EA within 15 days of discovery thereof.



31. It is further stated that on the basis of the documents submitted, CERC decides the tariff adoption petition along with adopting the trading margin of SECI. While on one hand the tariff discovered under e-RA is adopted by CERC, on the other hand, the PSA executed between SECI and the buying entities (usually the Distribution Companies ('**DISCOMS**'), are approved by the State Electricity Regulatory Commissions ('**SERC**') u/s 86 1(b) of the EA.

32. OP-6 has further stated that the position of competition law in India is that it is the prerogative of the procurer to decide the tender conditions/ technical specifications/ conditions and clauses in the tender document as per its requirements. In this regard, it has referred to Case No. 22 of 2018 (*G.P. Konar v Department of Agriculture and Farmers Welfare, Government of Haryana*) wherein the Commission relied on Case No. 69 of 2016 (*Suntec Energy Systems and National Dairy Development Board and Amul Dairy v. National Dairy Development Board*) wherein while dealing with the allegation that a tender condition resulted in making only one manufacturer a preferred supplier, the Commission observed as under:

> "*A procurer, as a consumer, can stipulate certain technical specifications/ conditions/ clauses in the tender document as per its requirements which by themselves cannot be deemed anticompetitive. It may be noted that the party floating the tender is a consumer and it has the right to decide on the appropriate eligibility conditions based on its requirements.*" The Commission also stated that, "*in a market economy, consumers' choice is considered as sacrosanct and in such an economy, a consumer must be allowed to exercise its choice freely while purchasing goods and services in the market. It is expected that a consumer can decide what the best is for it and will exercise its choice in a manner which would maximise its utility that is derived from the consumption of a good/ service.*"

33. OP-6 has also referred to Case No 38 of 2023 *(Harish Kumar v. S.B. Telecommunications & Ors.)* wherein the Commission held that:

> "22. *The Commission notes that OP-4 as a procurer has replied to the allegations made by the Informant, as briefly discussed above,*



> *concerning the tender process and is of the view that the allegations are misconceived and a prima facie case is not made out under the provisions of Section 3(3) of the Act which may merit an investigation into the matter. Further, the Commission is also of the view that setting tender terms and conditions is largely within the domain of the procurer and generally does not call for any interference within the provisions of the Act.*"

34. OP-6 has stated that the Informant has neither substantiated the nature of the allegations against it nor the contraventions of the Act alleged to have been committed by it. It has stated that a perusal of the Information shows that the Informant is using the terms 'combination' and 'anticompetitive agreements' without any appreciation of the fact that the scope and ambit of a 'combination' is entirely different from an 'anticompetitive agreement'. With regard to the Informant's allegation that '*Respondent No 1 to 4 in combination with Respondent No 5 and 6 have abused their dominant position market position and involved in anti-competitive (sic) and malpractices.*', OP-6 has stated that there has been no acquisition by it of any enterprises or any amalgamation/ merger with any other enterprise, more so with the other OPs, so as to trigger Section 5 of the Act. It is stated that OP-6 is a REIA having the role of an intermediary procurer and it is absurd to presume any meeting of mind between an intermediary procurer and a project developer or between an intermediary procurer and the DISCOM which causes or is likely to cause appreciable adverse effect on competition within India.

35. Regarding the applicability of the provisions of Section 4 of the Act, OP-6 has stated that factors test of three needs to be proved, *i.e.* 'delineation of relevant market', 'dominance in the relevant market' and 'resultant abuse in the relevant market'. It is stated that the Information levels allegation on OP-6 of abuse of dominant position without delineating any relevant market in which OP-6 is alleged to be dominant so as to attract the rigors of Section 4. Further it is stated that the Information is completely bereft of data/ figures/ statistics to substantiate the dominance of OP-6 or any sort of market power exercised in any relevant market whatsoever. Hence, it is stated that since OP-6 is not in a dominant position in any relevant market, there is no question of abuse thereof.




36. OP-6 has further stated that the Commission has time and again stressed that dominance of an enterprise in the relevant market is something which needs to be established rather than merely relying on hearsay statements/ media reports/ social media content. The Commission has in Case No 22 of 2024 (*InstaAstro Technology Private Limited v Astrotalk Services Private Limited*) held that the dominance of any entity cannot be solely established on the basis of media statements.

37. OP-6 has stated that the facts and circumstances outlined in the Information and the nature of issues/ allegations agitated before the Commission, does not give rise to competition concerns. Hence, no case of contravention of Section 3 or Section 4 of the Act warranting intervention of the Commission is made out and the matter deserves to be closed forthwith u/s 26 (2) of the Act.

38. OP-6 has also given point wise reply to allegations with regard to specific clauses of the RfS document.

39. Regarding the allegation that the RfS document was prepared in contravention of the MoP guidelines in as much that the said guidelines do not allow clubbing of solar power plants with solar manufacturing plants, thus implying that the RfS document was designed in a manner to ensure participation of only big players, OP-6 has stated that the said tender was floated 3 times, after having been annulled twice in 2019. It is stated that this establishes the intent and objective of Government to promote domestic manufacturing and reduce export dependency. It is stated that unlike the Production linked Incentive ('**PLI**') Scheme offered at present, in the Manufacturing linked Solar Scheme launched during 2018 and 2019, the only incentive offered to the prospective bidders/ developers was by the means of offering Solar Power Plant capacity only corresponding to Solar Manufacturing Plant capacity.

40. In response to the allegation that the 'Green Shoe Option' was provided by OP-6 in contravention of MoP guidelines, OP-6 has stated that MoP guidelines do not provide any specific provision for allotment of Green Shoe option, it also never restricts such allocation. Moreover, the Green Shoe option was included based on the provisions of Scheme guidelines issued by MNRE.



41. With regard to allegations by the Informant with reference to the clauses detailing issue of LoAs and Addendum to LoAs, OP-6 has stated that the details mentioned are factual information only and OP-6 cannot comment on these. It has further stated that due processes were followed and approvals of competent authority(ies) were obtained for issuance of LoAs and Addendum to LoAs to both the successful bidders. Regarding the undertakings given by OP-2 *vide* letter dated 08.06.2020 and by OP-5 *vide* letter dated 16.07.2020, OP-6 has stated that *vide* the said undertakings the developers demonstrated their intent and commitment to set up the Solar Manufacturing Plants even in the absence of PPAs corresponding to setting up of Solar Power Plants by them. These undertakings are completely in line with the objectives of Govt. of India to promote domestic manufacturing.

42. Regarding the allegation by the Informant that *vide* letters dated 02.02.2021 and 18.02.2021, OP-2 and OP-5 reduced the quoted bid price against the spirit of MoP Guidelines and RfS, thus showing the intention of OP-2, OP-5 and OP-6 that the whole bidding process was designed to oust the other bidders and to curtail competition in the market, OP-6 has stated that *vide* the said undertakings, the developers unilaterally reduced their quoted tariffs in order to make power saleable and affordable to prospective buying entity(ies).  Reducing the tariff is not at all contrary to any law, rather it is in larger public interest by means of offering lower tariff.

43. OP-6 has further stated that it executed PSAs with all the buying entity(ies) only after receipt of their consent and post approval from the respective SERCs as per the provisions of the Electricity Act, 2003 and that it executed PPAs with both the developers on back-to-back basis as per the provisions of RfS only.

44. With regard to the allegation that OP-5 did not even commence the basic activities related to awarded project capacity and OP-6 has not cross checked the development of project activities on the part of OP-5, OP-6 has stated that it monitors each and every project awarded by them not only on a monthly basis but as and when required.

45. Responding to the allegation that *vide* letter dated 02.03.2023, OP-5 have shown its intention that 2333 MW Projects' capacity which was awarded to them, shall be transferred to other bidder *i.e.* in the present case to OP-2 only, OP-6 has stated that it




had not received any such letter wherein OP-5 expressed its intention to transfer the capacity to OP-2. Further, in response to the Informant's allegation that on 06.07.2023, OP-2, OP-5 and OP-6 had a meeting where they have themselves decided to transfer the 2333 MW Project capacity which was awarded from OP-5 to OP-2, OP-6 has stated that no such decision was taken to transfer the 2333 MW Project from OP-5 to OP-2 in the joint meeting held on 06.07.2023. Rather the meeting was conducted to understand the concern of OP-5.

46. With regard to the allegation that OP-6 in a hurried manner without even looking for any other person or interested party, have signed PPA for 1799 MW capacity with OP-2 which again shows that the whole bidding process was just a cover to allocate the entire bidding capacity of 2000 MW solar power plant with 2000 MW manufacturing project to OP-2, OP-6 has stated that the PPAs for 1799 MW was executed as there was an unexecuted capacity available in the LoA of the developer for which PPAs were to be executed. Moreover, the decision was taken in consultation with the respective buying entity in order to fulfil their Renewable Purchase Obligation ('**RPO**') as well as to provide free electricity to the farmers and due legal process was also followed while reallocating this capacity.

47. Regarding the allegation that on 02.05.2024, OP-5 has surrendered the remaining capacity of 700 MW which was awarded under Package-I and same has also been reallocated to OP-2, OP-6 has stated that OP-5 surrendered the capacity of 700MW awarded under Package-I. However, the same was not re-allocated to OP-2. Hence, the aforementioned allegation is completely false.

48. On the allegations made by the Informant regarding other clauses of RfS/chain of events, OP-6 has stated that the same is part of factual information only and OP-6 cannot comment on these.

49. The Commission considered the Information, additional affidavits filed by the Informant, and the comments by OP-6 on the Information in its ordinary meeting held on 26.11.2025 and decided to pass an appropriate order in due course.





*Analysis of the Commission*

50. Regarding the first allegation that the RfS was issued by OP-6 in violation of the guidelines issued by MoP and was designed in a manner to favour OP-2 and OP-5 while ousting others from competition, the Commission observes that the same does not appear to be a competition issue to be covered under the Act. Further, the Informant has not been able to furnish any evidence in support of his allegation that OP-5 was only a cover bidder for OP-2.

51. Regarding the allegation of abuse of dominant position by the Adani Group, the Commission noted that power in India is generated through various sources such as coal, solar, wind, hydro, nuclear, *etc*. Further, in such power generation market, not only private power generation companies but also several major public power generation companies are operating. The Informant has also not placed on record any evidence which may suggest as to why solar power, or public and private power generation companies, ought to be treated as distinct markets.

52. As such and in view of the fact that power generation market in India is comprised of many significant players *viz.* National Thermal Power Corporation, Power Grid Corporation of India Ltd., Tata Power Co. Ltd., Torrent Power and Reliance Power *etc.,* the Adani Group, *prima facie*, does not seem to be a dominant player in the power generation market in India. Even in the '*power generation from renewable sources*' market, other prominent players like Tata Power, JSW Energy and Suzlon Energy are also operating.

53. Further, the Commission observes that allegation against OP-2 of deriving benefits like cross-subsidisation and economies of scale from other Adani Group entities does not substantiate that it is in a dominant position in terms of Section 4 of the Act. Regarding the Informant's other allegations of leveraging, exclusion, creation of entry barriers, bid-rigging discrimination *etc.* no cogent evidence has been produced by the Informant in this regard. As such, there is no clear evidence on record which may establish dominant position or its abuse by OP-2.

54. Further, the alleged conduct *i.e.* offering of bribes to government officials to enable OP-6 to enter into PSAs with buying utilities, in turn allowing OP-2 to enter into PPAs with




OP-6, also does not seem to qualify as an abusive conduct (exclusionary or exploitative), within the meaning of Section 4 of the Act.

55. With regard to the clause-specific allegations made by the Informant, the Commission observes that the Informant has not provided any cogent evidence of the RfS documents being designed in a manner that encourages participation of only big players in the market. It is noted that tender design is made according to specific requirements of the procurer. As stated by OP-6, the tender was floated thrice with an intent to attract participation according to the prevailing incentive scheme at the time. Further, the Informant has not been able to demonstrate how any clause of the RfS referred to in the Information or chain of events described therein is in contravention of the provisions of the Act.

56. Further, there appears to be no anti-competitive conduct in adopting a Green Shoe Option in terms of restriction of participation. The Commission noted that the said issue was also dealt with in a petition related to the same RfS (Petition No. 286/AT/2021) *vide* order dated 02.04.2022, by the CERC, in which it had observed:

> "*69…As regards objection regarding Green Shoe Option being against the Act and the Guidelines, we have already observed above that Section 63 of the Act does not prescribe the type of bid structure to be adopted by the Central Government. It has been left open to the Central Government to decide the provisions of the Guidelines and bid structure for procurement of power. Accordingly, the said incorporation of Green Shoe Option cannot be held as non-compliance of any specific provision of the Act. In the present case, MNRE, Government of India vide its letter dated 14.8.2019 directed SECI to incorporate 'Green Shoe Option' in the bid. The relevant extract of the said letter dated 14.8.2019 is extracted below.*
>
>> *"In refence to the subject RfS, the undersigned is directed to convey to SECI, that in line with discussions with industry stakeholders and further examination in MNRE, the following decision have been taken by MNRE:*
>>
>> *……………*
>>
>> *viii SECI to provide a "Green-Shoe Option" to successful bidder(s) equivalent to the capacity(ies) won by such successful bidder(s). The above decisions are in line with the approval from Hon'ble Minister (Power & NRE)"*
>
> *The said provision was reiterated in the letter dated 9.10.2019 issued by MNRE, Government of India as under:*



> *"2. The following has been decided with regard to SECI's Manufacturing-Linked-PPA Tender:*
>
> *(d) The earlier instructions to SECI, vide letter no. 336/39/2017-NSM (Part File) dated 14.08.2019, may accordingly be read as under :*
>
> *………..*
>
> *vi SECI to provide a "Green-Shoe Option" to successful bidder(s) equivalent to the capacity(ies) won by such successful bidder(s).*
>
> *3. This issues with the approval from Hon'ble Minister (Power & NRE)"*

57. The Commission notes that the aforementioned order of the CERC also dealt with similar issues as raised in the Information such as a) Combining activity of generation with manufacturing of equipment used in generation (CERC observed that "*56…contrary to the submissions made by the objector, there is no bar on linking Solar Manufacturing Plants with PPAs for Solar Power Plants.*); b) Reduction of quoted bid price by OP-2 and OP-5 (CERC observed that "*68…while any upward revision of tariff after conclusion of the e-reverse auction by the Petitioner shall be against the principle and objective of Guidelines leading to undue benefit to the successful bidders, any downward revision of tariff by the successful bidders benefits the consumers in terms of lower tariff. Therefore, the reduction of tariff by the successful bidders on voluntary basis does not violate the Guidelines.*").

58. Further, the Commission observed that stipulating capacity generation and financial eligibility criteria in tenders is a standard practice, and the same cannot be faulted with in the impugned RfS merely because the market may be having a large number of smaller players as well. Therefore, under the purview of the Act, the above clauses of the RfS cannot be stated to have been inserted with a view to oust competition.

59. Upon consideration of the facts and circumstances of the present case, the Commission is of the view that there is no *prima-facie* case of contravention of provisions of Sections 3 and 4 of the Act warranting an investigation into the matter. Therefore, the matter is directed to be closed forthwith under Section 26(2) of the Act.





60. The Secretary is directed to communicate the decision of the Commission to the Informant and OP-6, accordingly.

**Sd/-**
**(Ravneet Kaur)**
**Chairperson**

**Sd/-**
**(Anil Agrawal)**
**Member**

**Sd/-**
**(Sweta Kakkad)**
**Member**

**Sd/-**
**(Deepak Anurag)**
**Member**

**New Delhi**
**Date: 16/04/2026**